IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JIMMY D. BURDETTE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-CV-486-JPG |
| ) | |
| JENNIFER McCLOSKEY et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

This matter is before the Court on Burdette's motion for leave to proceed *in forma pauperis* (Doc. 2). The Court previously granted Burdette leave to proceed as a pauper in a related case. (Case No. 06-cv-445-JPG, Doc. 5). Nevertheless, the Court must deny his motion and dismiss this suit if his claims here are frivolous or malicious. *See* 28 U.S.C. § 1915(e)(2)(B)(I); *Lucien v. Roegner*, 682 F.2d 625, 626 (7th Cir. 1982). For present purposes, a claim is frivolous if it lacks arguable legal merit or factual support. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Corgain v. Miller,* 708 F.2d 1241, 1247 (7th Cir. 1983).

Burdette has sued Jennifer McCloskey, the assistant State's Attorney for Williamson County, Lisa Beatty Avery, Assistant State's Attorney for Williamson County, Tom Cundiff, the Sheriff of Williamson County, Mark Brown, Chief of Police for the City of Herrin, and all other members of the Herrin Police Department for maliciously prosecuting him in violation of the Fourth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Burdette asks the Court to quash his outstanding state warrant for stalking, to dismiss the stalking action, to appoint an attorney

to represent him in the state action[1], to enjoin the ongoing state proceedings against him, to expunge all orders of protection obtained by several of his ex-lovers, and to expunge a 2003 conviction and arrest for trespassing. He also prays for compensatory and punitive damages against all defendants.

## BACKGROUND

The factual basis for Burdette's claims is set forth in a rambling 24-page, single spaced document attached as an exhibit to the complaint.[2] When drafting this document, Burdette assumed his reader would be familiar with certain facts, which makes it difficult for the uninitiated to follow his train of thought. Though he only specifically pleads two claims for relief in the complaint itself, he pleads more than thirty others that can reasonably be subsumed within the first two or stand on their own. Nevertheless, a few things are clear. On May 30, 2006, Burdette was charged by information with one count of stalking, a Class 4 Felony. (Doc. 1 at 6). According to the information, "Burdette put Linda K. Sargent under surveillance on two separate occasions . . . plac[ing her] in reasonable apprehension that she would receive future bodily injury or sexual assault." (*Id.*).

Burdette claims Herrin police officers encouraged Sargent to file the complaint leading to the information, knowing it had no basis in fact or law. He claims the Williamson County State's Attorney's Office pursued the case, despite its frivolity, in retaliation for Burdette's filing of numerous complaints against city and county officials. Given his *pro se* status and somewhat disjointed style, it is difficult to separate his federal claims from his personal attacks on the virtue

---

[1] Burdette believes the representative from the Williamson County Public Defender's office and another attorney (apparently appointed after he complained of his first) are in cahoots with the government or biased against him.

[2] This document is the same, or substantially, the same as that he attached to his motion for an *ex parte* temporary restraining order in Case No. 06-cv-445-JPG.

of Herrin (Illinois) police officers and the women they "associate" with. But, construing his pleading in his favor, the Court has identified 31 separate alleged civil rights violations and assigned each of these claims a corresponding roman numeral for ease of disposition. To understand the basis of Burdette's claims, one must have a grasp of Burdette's turbulent history with several women and the Herrin police

### I.   Burdette's Relationship with Nancy Goodermote

Burdette's problems with Herrin police began in June 2003, as a result of his tempestuous relationship with a woman named Nancy Goodermote, his live-in girlfriend at the time. On June 15, 2003, Nancy told police Burdette kidnapped her; for this reason, at Nancy's request, the police removed him from her home. When Burdette came back to talk to Nancy 30 minutes later, Herrin police officers, including Sean Mocaby, arrested him. Mocaby began dating Nancy soon after arresting Burdette and encouraged her to obtain an order of protection against him.[3] Burdette claims this order of protection, issued in July 2003, was facially invalid; according to Burdette, it evidences a conspiracy among Herrin police officers and Williamson County judges to violate his rights (I).[4]

Nancy "dropped" her order of protection on August 13, 2003. Nevertheless, a few days later officer Stu Ridings stopped Burdette near Nancy's house after a neighbor called to complain about

---

[3] Burdette claims Herrin police officer Stu Ridings had sex with Nancy after Ridings escorted Burdette while he removed his things from Nancy's house. Elsewhere, Burdette claims Nancy had sex with various other named and unnamed law enforcement officers, including: Illinois State Police Officer Chuck Galatin, Williamson County Sheriff's Deputy McCabe, Energy Police Officer Clint Ronchetto, and Herrin Police Officers Mocaby, Blake and Jimmy Lloyd.

[4] Burdette claims various unidentified officers pulled Burdette over several times that month without arresting him or issuing any citations.

his presence.  Burdette told Ridings Nancy dropped the order of protection.  Ridings responded by stating, "You know how it is, a black man walking in an all white area."  (*Id*. at 10).  It is unclear whether Ridings made this statement as a justification for his own actions or in explanation of the neighbor's phone call; regardless, Ridings did not arrest Burdette that day.  On August 18, 2003, Burdette went to Nancy's house, and, while looking through her windows, saw her smoking marijuana in front of Mocaby.  Burdette, upset at the situation[5], went to both the Chief of the Herrin Police and the Mayor to complain about Mocaby's behavior.  They told him that Mocaby was a good officer and refused to take any action (II).

Nancy obtained another order of protection against Burdette on September 14, 2003. (Doc. 1 at 11).  He claims various infirmities in this order and a state court judge's denial of his motion to reconsider its issuance amounted to a violation of his rights under the Fourth, Eighth and Fourteenth Amendments (III).  According to Burdette, the judge (unidentified in the complaint) was only interested in "protecting his white officers against a black man."  (*Id*. at 12).  Nancy had another order of protection served on Burdette on September 18, 2003. Nancy had Burdette arrested for violating the order after he came over the next night.  Burdette denies going to her house that night; he claims he was singing karaoke in Marion, Illinois at the time (a town about 10 minutes away from Nancy's house), which the officers would have known if they had investigated Nancy's claims.  He believes their failure to investigate was a result of their desire to get back at him for complaining about Mocaby's behavior to the chief of police and the mayor (IV).

Burdette was arrested for violating the order again on September 24, when he and Nancy were at the same bar, the Timeout Sports Bar in Herrin; this arrest got him banned from the bar.  He

---

[5] Burdette believes Mocaby gave Nancy drugs in return for sexual favors.

claims this arrest was invalid because the order of protection did not say that he could not be in public places with her (VI).  Burdette was arrested at Timeout again a few days later, this time for trespassing, when he went to talk to the owner about being banned.  Burdette believes this arrest, his prior arrests, the state judges' unwillingness to take his calls and the judges' failures to hear his side of the story at court hearings after his arrests evidence a conspiracy among the judges, Herrin police, Nancy and the owner of the bar to violate his civil rights (VII).

In November 2003, for a reason not specified by Burdette, Williamson County Sheriff's Deputy McCabe arrested Burdette at the Ranch, a bar between Johnston City, Illinois and West Frankfort, Illinois.  After taking Burdette to the Williamson County jail after this arrest, McCabe deleted Nancy's phone number from Burdette's cell phone (VIII). (*Id*. at 14). After deleting her number, McCabe told Burdette he wished he would "just leave town because [he was] tired of fucking with him." (*Id*.).  When Burdette asked McCabe if this was a threat, McCabe said it was.[6]  A few days later, Burdette filed a complaint against McCabe with Sheriff Cundiff; that day he also served a copy of the complaint on the State's Attorney.  After he left the State's Attorney's office, an unnamed sheriff's deputy told Burdette he would be arrested if he went to the State's Attorney's office again.  Burdette also claims the State's Attorney's office refused to allow him access to the law library at their Marion, Illinois office (IX).  He was also upset that Jennifer McCoskey, the assistant prosecuting Burdette for his violations of the orders of protection, refused to talk to him, despite his status as a *pro se* litigant (X).  (*Id*. at 15).

Williamson County Judge Ronald Eckiss held a hearing on Burdette's motion to reconsider the issuance of one of Nancy's orders of protection on November 26, 2003.  According to Burdette,

---

[6] Burdette believes McCabe was also seeing Nancy at this time

Eckiss wrongfully refused to grant the motion because Burdette admitted he violated the order of protection. Burdette vehemently denies he made such an admission; thus, he claims Eckiss's failure to grant the motion was unconstitutional (XI). Burdette also claims the Public Defender's office sabotaged this hearing because its representative, Alex Fine, who Burdette says was not his attorney, told Judge Eckiss he advised Burdette not to pursue the matter. Burdette claims Fine colluded with Judge Eckiss and the State's Attorney's office to deprive him of his civil rights (XII). Judge Eckiss further violated his rights because he refused to read a letter from Burdette's mother and did not have a court reporter present at the hearing (XIII).

Burdette sets out a litany of other civil rights violations. On January 11, 2004, an Illinois State Trooper stopped him on his way home from a night club and issued him a bogus seat belt ticket because he knew about his relationship with Williamson County law enforcement officers (XIV). (*Id*. at 16). Several other officers followed Burdette on numerous times in early 2004, but did not arrest him (XV).

Burdette was followed (Burdette believed he was in danger and was being chased) by an unmarked vehicle after he finished singing karaoke at a bar in Johnston City on July 2, 2004. This car followed him back to Herrin, where Herrin police officer Jimmy Lloyd pulled him over. At this point, Burdette found out that the he was being chased by a Herrin police officer in an unmarked police car. This officer, unidentified by Burdette, told Lloyd that Burdette had been traveling at least 100 m.p.h. Burdette told the officer this was impossible given the condition of his car, but admitted going approximately 80 m.p.h. because he believed his life was in danger. Lloyd did not believe Burdette and issued him a traffic ticket. Burdette claims Lloyd and the other officer intentionally orchestrated events to harass him and deprive him of his civil rights (XVI).

Burdette and Nancy reconciled sometime in May 2004. She was with him at his apartment on July 3, 2004, when he called Herrin police to complain that some of his neighbors were illegally shooting off fireworks. Mocaby responded to Burdette's call, saw Nancy in Burdette's place, and was so angry that he put burned a cross in the street in front of Burdette's apartment (XVII). A Williamson County Sheriff's deputy issued Burdette a ticket for driving on a suspended license later that month. Nancy's son, who was with Burdette at the time, was arrested on an outstanding warrant after Burdette was ticketed. Burdette went to Nancy's house to get money to make bail, and went to the Williamson County jail to bail her son out of jail. Burdette posted bail but did not receive a receipt. He waited after jail personnel told him that it would take a few minutes to process Nancy's son. Burdette became suspicious after waiting for some time. When he questioned a jail employee again, his special forces training made him aware that this person was lying to him. Only later did he find out that Nancy's son had been released from jail sometime earlier; Burdette believes the officer pulled him over and jail personnel delayed him so that Mocaby could have some time alone with Nancy (XVIII). When Burdette went back to Nancy's house, Nancy asked for the bail receipt. Nancy was quite upset that Burdette did not have a receipt. The next day, Burdette found the $300.00 bail money while looking through Nancy's purse. Burdette claims that Nancy and her son conspired with the deputy and Herrin police to keep him away from her house so that she could spend time with Mocaby.

While walking by Nancy's house 10 days later at 3:00 a.m., Burdette noticed that her lights were on. When he started to approach from the front, someone shut the lights off; someone shut the lights off when he walked around back as well. Burdette began to feel that he was walking into another setup so he quickly left without inquiring further. On his way home, he saw a Carterville

police officer on Nancy's corner.  When he got home, he spoke to his neighbor, a known police informant who has informed on Burdette several times and keeps track of his daily comings and goings for police, told Burdette there was going to be a "bust" near Nancy's house.  Burdette claims Galatin, another State Trooper sleeping with Nancy at the time, conspired with the unnamed Carterville cop to "bust" him at Nancy's place (XIX).  As Burdette left when he felt uneasy about the situation, their plan did not come to fruition.  (*Id*. at 20).

In mid-September 2004, Burdette awoke one morning to find that someone had written "KKK Rules," "HPD," and "Nigger what!" in soap on his car.  (*Id* at 22).  He called the police but they failed to investigate the matter (XX).  The next morning, his neighbor Derrick Jarvis (the neighbor/informant who keeps track of his activities), Danny McCain and Roger Snider (other police informants) began taunting him, trying to pick a fight at restaurant in Herrin.  One of these individuals was on the phone with the police dispatcher at the time.  Burdette called the Herrin police to report the incident, but the dispatcher on the phone at the time refused to corroborate Burdette's story.  Burdette claims Jarvis, McCain and Snider conspired with the police in an attempt to get him arrested for fighting.  He claims this conspiracy coupled with officers' failure to respond to Burdette's complaint about the incident was a violation of his civil rights so egregious as that it amounted to a hate crime (XXI).  That night, Burdette got very intoxicated at Berra's Tavern and "passed out" in someone's yard.  (*Id*. at 22).  Officer Blake, who Burdette claims is a known racist (who was also sleeping with Nancy), responded to the homeowner's complaint and wrongly accused Burdette of stealing a stereo out of a car near where he "passed out" that night (XXII).

The next day (September 14, 2004), detectives Scott Stephon and Bruce Grau came to investigate a complaint made by Jarvis, McCain and Snider about their interaction with Burdette the

prior day. They claimed that Burdette burned a cross in McCain's front yard in retaliation for their threats of violence. (*Id*. at 23). Burdette claims that Stephon and Grau's investigation of McCain's complaint, when viewed in conjunction with their failure to investigate Burdette's claims against those three, reveals another conspiracy to deprive Burdette of his constitutional rights (XXIII).

Officer Lloyd stopped Burdette on October 2, 2004. Though he did not arrest him, Burdette claims Lloyd stopped him because Burdette had been telling people that Lloyd had also been sleeping with Nancy (XXIV). (*Id*. at 23).

## II.     Burdette's Relationship with Debra Cox

Burdette obtained an order of protection against Debra Cox on January 10, 2005.[7] Cox had the order vacated on January 14 and filed her own order of protection against Burdette. (*Id*. at 24). Burdette believes the disparate treatment received by he and Cox (Cox's order was apparently not vacated) shows that the judge's ruling was motivated by a discriminatory animus (XXV).

Cox filed a police report on January 9 alleging that Burdette battered her on January 2. A warrant was issued and Officer Lloyd came to arrest Burdette while Burdette was officiating several youth basketball games on January 21, 2005. Lloyd told Burdette during halftime of his first game that he was going to arrest him, but said he would allow him to finish refereeing the rest of his games that night. During timeouts, halftimes and other game stoppages, Herrin police blocked the exits from the gymnasium. Burdette claims this was a scheme orchestrated by Cundiff, Lloyd, Detective Fratini (of the Sheriff's Department) and others (he implies that Chuck Garnati, the State's Attorney for Williamson County, was complicit in this scheme as well) to discredit and embarrass him while he was working (XXVI). (*Id*. at 25). He claims this arrest was well-known throughout

---

[7] Notably, he claims the order he requested should not have been granted.

the community and that it has hurt his reputation and his career. Burdette attempts to allege yet another conspiracy on January 26, the date of the plenary hearing on his order of protection against Cox, but has made his allegations in such a fashion as to render them incomprehensible (XXVII).

Sometime during this period, Burdette filed a complaint with the Herrin Police department after Cox's companion, Dave Berger, threatened his life several times. (*Id*. at 24, 26). Burdette claims Herrin police threw out this and numerous other complaints made by him because he is black (XXVIII). (*Id*. at 26). On May 26, 2006, Burdette was volunteering at Herrinfesta Italiana, a yearly festival celebrating the community's Italian heritage, when Mocaby and Brown told Herrinfesta officials that Burdette could not volunteer at the festival (XXIX). (*Id*. at 29).

### III. Burdette and Linda Sargent

Burdette met Sargent at the Timeout Sports Bar on April 14, 2006 (Timeout lifted its ban when new owners took over its operations). Burdette had sex with Sargent later that night. (*Id*. at 30). The next morning, Sargent told Burdette to call her on April 16. He called as asked, but Sargent did not answer her phone. He went to her house again on April 17, they talked for a few minutes and he left shortly after arriving. After refereeing a basketball game the next day in Chester, Illinois, Burdette stopped for a sandwich at the Hardee's in Murphysboro; Sargent was working at the time. On April 27, Burdette went to the Hardee's in Herrin to get a sandwich; Sargent was working at the Herrin Hardee's that night as well. When Burdette called Sargent on May 2, Sargent told him she did not feel comfortable talking to him because she "heard that [he] had an arrest record." (*Id*. at 30). Five minutes later, Officer Chad Parks called Burdette and told him not to call Sargent again. Like Nancy, Sargent is apparently sleeping with numerous police officers. (*Id*. at

30). Burdette believes Sargent conspired (XXX) with the police and trumped up the stalking charge because Burdette called her a liar and told her "that her sexual hygiene needed serious attention." (Doc. 1 at 3). Burdette also claims the State's Attorney's office is prosecuting the stalking charge in retaliation for his complaints against members of that office and other Williamson County law enforcement officers (XXXI).

## ANALYSIS

### I. Claims I through XV

The events giving rise to Burdette's first fifteen claims took place more than two years before he filed this action. Therefore, they are barred by the two-year statute of limitations period that applies to federal civil rights claims brought in federal courts in Illinois. *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001); *Ashafa v. City Chicago*, 146 F.3d 459, 462 (7th Cir. 1998). Because these claims are frivolous, the Court dismisses them **WITH PREJUDICE**.

### II. Claims XVI through XXXI

Burdette's remaining claims can only be described as fantastic, and when viewed objectively, their outlandishness certainly gives them the appearance of frivolity. Nevertheless, if one takes for granted the events set forth in Burdette's factual recitation, his suppositions on the motives of the defendants, though bordering on the paranoid, cannot be dismissed out of hand. And though it is reasonably clear that many of Burdette's claims cannot stand because of the protections afforded prosecutors for activities taken in their quasi-judicial capacity, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Spiegel v. Rabinovitz*, 121 F.3d 251, 256 (7th Cir. 1997), the Court will not dismiss his case as frivolous at this point. However, there are a number of matters that need to be cleared up at this point. First, though Burdette named Lisa Beatty Avery as a defendant in this matter, he

has failed to mention her again anywhere in his pleadings. Therefore, the Court **DISMISSES** her as a defendant in this case. Second, the Court must make a few observations regarding the relief Burdette requests.

As mentioned above, Burdette wishes this Court to enjoin the ongoing stalking proceedings in state court. Interfering in ongoing state proceedings is something that federal courts are understandably loathe to do. In *Younger v. Harris*, 401 U.S. 37, 45 (1971), the Supreme Court indicated that in almost all cases, when a federal court is asked to enjoin pending state proceedings, it should not issue the requested injunction. Under no circumstances should a federal court enjoin state proceedings "when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id*. at 43-44. The hesitancy to interfere is motivated by notions of comity, sometimes referred to as "Our Federalism." *Id*. at 44. Interfering in state court proceedings is rarely appropriate in the absence of the sort of circumstances that prompted the enactment of § 1983, when "state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." *See Pulliam v. Allen*, 466 U.S. 522, 540 (1984) (quoting *Mitchum v. Foster*, 407 U.S. 225, 240 (1972)).

There is no indication that Burdette is without an adequate remedy at law. Furthermore, and more importantly, Burdette has not demonstrated the factual predicate necessary to obtain the extraordinary relief he requests. *See Dombrowski v. Pfister*, 380 U.S. 479 (1965). There is simply no indication that the state court "would not afford adequate protection" of Burdette's constitutional rights. *Younger*, 401 U.S. at 45. Therefore, the Court **ABSTAINS** from exercising jurisdiction in this case to the extent Burdette requests its interference in the proceedings currently pending in

Williamson County. For the same reasons, the Court will not appoint Burdette an attorney to represent him in state court. It will only entertain Burdette's claims to the extent he seeks damages against defendants as a result of their alleged violations of his civil rights.

### CONCLUSION

Burdette's motion to proceed *in forma pauperis* (Doc. 2) is **GRANTED**. The Court **ABSTAINS** from exercising jurisdiction in this case to the extent Burdette requests its interference in the proceedings currently pending in Williamson County. If at any time the Court becomes convinced that Burdette's claims are indeed frivolous, it will dismiss this case. *See* 28 U.S.C. 1915(e)(2)(B)(i), (iii).

If Burdette wishes the United States Marshal Service to serve process in this case, the Court **DIRECTS** him to provide to the United States Marshal Service the summons issued in this case, the appropriately completed USM-285 forms and sufficient copies of the complaint for service.

The Court further **DIRECTS** the United States Marshal, upon receipt of the aforementioned documents from the plaintiff and pursuant to Federal Rule of Civil Procedure 4(c)(2), to serve a copy of the summons, complaint and this order upon the defendants in any manner consistent with Federal Rule of Civil Procedure 4, as directed by Burdette. Costs of service shall be borne by the United States.

**IT IS SO ORDERED.**

**Dated: July 24, 2006.**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**U.S. District Judge**